# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

PHYSICIAN'S SURROGACY, INC.,

Plaintiff,

v.

KENIA GERMAN; ELITE WOMEN
SURROGACY LLC; GLORY NASH;
VERONICA MUNOZ; JESSICA SIMAS;
XOCHITL RACHELLE MACIAS;
CLAUDIA ESCAMILLA; KARLA
JIMENEZ; RAFAEL MARTINEZ; and
ESMERALDA LEON,

Defendants.

Case No.:  17cv718-MMA (WVG)

**ORDER:**

**(1) GRANTING IN PART
DEFENDANTS' MOTIONS TO
DISMISS; AND**

[Doc. Nos. 41, 42, 43]

**(2) DENYING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

[Doc. No. 40]

On April 7, 2017, Plaintiff Physician's Surrogacy, Inc. ("Plaintiff"), filed this
action alleging multiple causes of action against Defendants Kenia German, Glory Nash,
Veronica Munoz, Jessica Simas, Xochitl Rachelle Macias, Claudia Escamilla, Karla
Jimenez, Rafael Martinez, and Esmeralda Leon.  *See* Doc. No. 1.  After the Court's order
regarding Defendants' various motions relating to the complaint, Plaintiff filed a First
Amended Complaint ("FAC"), adding Elite Women Surrogacy LLC as a defendant.  *See*
Doc. No. 34 ("FAC").  Via three separate motions, Defendants move to dismiss

1

Plaintiff's claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Doc. Nos. 41, 42, 43. Also, Plaintiff moves for a preliminary injunction. *See* Doc. No. 40. The Court took the matters under submission on the briefs and without oral argument pursuant to Civil Local Rule 7.1.d.1. Doc. No. 48. For the following reasons, the Court **GRANTS IN PART** Defendants' motions to dismiss. Doc. Nos. 41, 42, 43. Specifically, the Court **DISMISSES** Plaintiff's federal claims, and declines to exercise supplemental jurisdiction over all state law claims asserted. Further, the Court **DENIES** without prejudice Plaintiff's motion for a preliminary injunction. Doc. No. 40.

## BACKGROUND[1]

Plaintiff is a "private fertility and surrogacy agency located in San Diego, California, recruiting surrogates and other donors so that a medical corporation may provide in vitro fertilization and surrogacy and egg donation services for intended parents who can select from a qualified pool of surrogates." FAC, ¶ 18. Plaintiff has a "unique affiliation with a medical corporation, Reproductive Sciences Medical Center, Inc.," ("RSMC") which allows Plaintiff and RSMC to provide an "integrated service where agency and surrogate recruiting services are uniquely and seamlessly integrated with fertility medical procedures to match surrogates and intended parents for procedures such as surrogacy, egg donation and fertility treatment." *Id.* Based on this close affiliation, Plaintiff and RSMC "are commonly referred to collectively as 'RSMC.'" *Id.* A "key aspect of Plaintiff's business" is the recruitment of potential surrogate mothers. FAC, ¶ 20. "Plaintiff earns revenue and surrogates are compensated through funds delivered by the intended parents who assume parenting responsibilities for the baby immediately upon birth." FAC, ¶ 26.

---

[1] For the purposes of determining the pending motions to dismiss, the Court must accept as true the allegations set forth in the FAC. *See Hosp. Bldg. Co. v. Trs. Of Rex Hosp.*, 425 U.S. 738, 740 (1976). However, in doing so, the Court does not make any findings of fact.

Plaintiff has expended "significant time and resources creating and developing proprietary business methods, systems, processes, procedures and programs—all of which are specifically tailored to Plaintiff's uniquely integrated surrogacy and fertility services—for surrogate intake, recruiting, and management of records of surrogates, fertility services and intended parents." FAC, ¶ 23. Plaintiff has also "invested and spent significant time and resources creating its own unique work product to facilitate its proprietary business methods and systems, including, but not limited to, surrogacy applications, screening forms and surrogacy case checklists." *Id.* For that reason, Plaintiff requires employees to sign the Proprietary Information and Innovation Assignment Agreement ("PIIAA"), which "requires employees to maintain Plaintiff's proprietary information [such as customer lists] and trade secrets confidential both during and after termination of the employment relationship." FAC, ¶ 24. The PIIAA also prohibits employees, during the term of their employment, from "engag[ing] in any employment or business activity which is competitive with, or would otherwise conflict with, [the employees'] employment" without Plaintiff's "express written consent." FAC, ¶ 60. Further, for one year after the date of termination of their employment with Plaintiff, the PIIAA prohibits former employees from soliciting or attempting to solicit any of Plaintiff's employees to terminate their employment with Plaintiff, or inducing or attempting to induce any person or entity "to terminate a relationship with" Plaintiff "or interfere with [Plaintiff's] business relationships." FAC, ¶ 63. The PIIAA also prohibits the use of "Proprietary Information to solicit or attempt to solicit the business of any customer . . . of the Company" who, "at the time of termination or one (1) year immediately prior thereto, was doing business with the Company, or listed on the Company's customer . . . list, if the result of the solicitation of business would be any reduction in the business which would have been transacted between the Company and such [entity]." *Id.*

Defendant German began working for Plaintiff as a recruiter on April 1, 2016, and was promoted to a "Senior Surrogacy Recruiter" shortly thereafter. FAC, ¶ 27. In that

position, Defendant German "supervised recruiting, screening, and approval of applications by potential surrogates, as well as the overall surrogacy process once surrogates were approved and had signed contracts with Plaintiff." *Id.* Defendant German "worked with a team of subordinate employees," including Defendants Nash, Simas, Macias, and Munoz. *Id.* "Immediately after her employment commenced in the spring of 2016," Defendant German formulated a plan to terminate her employment with Plaintiff and form a competitive surrogacy agency. FAC, ¶ 28. Defendant German "conspired with the other Defendants in this action to misappropriate Plaintiff's trade secrets, proprietary information and property and to steal Plaintiff's surrogate clients and employees." *Id.*

Beginning on approximately April 5, 2016, "Defendants misappropriated a significant amount of [Plaintiff's] proprietary information and trade secrets." FAC, ¶¶ 29, 30. "All of Plaintiff's information regarding applications, screening, identification of surrogates and matching with intended parents is stored on Plaintiff's computer systems, including its own server." FAC, ¶ 22. Accordingly, Defendants emailed the proprietary information "from [Plaintiff's] computers and work email accounts, to an outside Gmail email address at rsmcsurrogacy@gmail.com, which Ms. German (and/or the other Defendants) created in or around early 2016." FAC, ¶ 29. For example, "Defendants emailed lists of Plaintiff's surrogates and potential surrogates, as well as Plaintiff's proprietary forms reflecting Plaintiff's unique business methods, systems, processes, procedures and programs . . . , intake forms, surrogacy applications and other proprietary documents." *Id.* Also, on or around April 29, 2016, Defendant German sent emails to an email address belonging to her husband, Defendant Martinez, with copies of proprietary information such as "email templates for various surrogacy-related scenarios, surrogacy FAQs, intake forms, benefit lists and job descriptions." *Id.* Defendant Martinez bought computer hardware to store the information. *Id.*

At some point, Defendants Escamilla and Jimenez, who are Defendant German's sisters-in-law, began to use the email address "rsmcsurrogacy@gmail.com" to email

Plaintiff's potential surrogates and surrogates who had already entered into contracts with Plaintiff. FAC, ¶ 33. Defendants told the recipients that the email address was a new address for Plaintiff, and solicited information from them under the pretenses that they were acting on Plaintiff's behalf. FAC, ¶ 32. In those emails, the sender was listed as "RSMC Fertility." *Id.* Defendants chose to use "RSMC" in the name of the sender and in the email address in order to "intentionally confuse Plaintiff's surrogates and potential surrogates" into thinking that they were communicating with Plaintiff's employees. *Id.* Further, Defendant Escamilla signed her name on emails as "'Assitant [sic] to Kenia German, Surrogate Program Director,' and included Plaintiff's RSMC logo and address." FAC, ¶ 34. Plaintiff alleges that Defendants ultimately used the email address to "induce surrogates to breach their Acceptance Agreements with Plaintiff" and persuade them to instead act as surrogates for Defendants' competing business. FAC, ¶ 37.

On approximately December 20, 2016, Defendants German and Martinez "filed for a fictitious business name of 'Elite Women Surrogacy' with the County of Orange Clerk-Recorder." FAC, ¶ 35. Defendants also created a Facebook page for Elite Women Surrogacy, which "states that the business launched on November 12, 2016." *Id.* On approximately April 20, 2017, Defendant German "filed a form LLC-1 with the California Secretary of State to cause the legal formation of Elite Women Surrogacy LLC, through which individual Defendants named herein conduct business as a 'Third Party Reproductive Agency.'" FAC, ¶ 36.

In February 2017, Defendant German resigned from her position with Plaintiff, and Defendants Nash, Simas, Macias, and Munoz followed suit "within a few weeks." FAC, ¶¶ 30, 31. Following their resignations, Defendants began operating Elite Women Surrogacy "in full force." FAC, ¶ 38. Since her resignation, Defendant German has allegedly "refused to return certain property of Plaintiff's, including a company credit card, office keys, an electronic key card and a cell phone." FAC, ¶ 100.

Based on the foregoing, the FAC asserts the following causes of action against all Defendants: violation of the Economic Espionage Act ("EEA"), for misappropriation of

trade secrets, 18 U.S.C. § 1831 *et seq.*, as amended by the Defend Trade Secrets Act of 2016 ("DTSA"), PL 114-153, May 11, 2016, 130 Stat 376;[2] violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502; violation of the California Business and Professions Code, Cal. Bus. & Prof. Code § 17200; conversion; and civil conspiracy. *See* FAC. The FAC also alleges: breach of contract claims against Defendants German, Nash, Simas, Macias, and Munoz; claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against Defendants Escamilla, Jimenez, and Martinez; claims for breach of the duty of loyalty against Defendants German, Nash, Simas, Macias, and Munoz; and a cause of action for "claim and delivery" against Defendant German. *See id.*

## MOTIONS TO DISMISS

Defendants have filed three motions to dismiss. Doc. Nos. 41, 42, 43. Specifically, Defendants Nash, Munoz, Simas, Macias, and Leon move to dismiss the following claims pursuant to Rule 12(b)(6) for failure to state a claim: violation of the DTSA; breach of contract; violation of California's Comprehensive Computer Data Access and Fraud Act; breach of the duty of loyalty; violation of California's Business and Professions Code; conversion; and civil conspiracy. *See* Doc. No. 41-1.

Defendants Escamilla, Jimenez, and Martinez join the motion to dismiss filed by Defendants Nash, Munoz, Simas, Macias, and Leon insofar as it requests dismissal of the following claims: violation of the DTSA; violation of California's Business and Professions Code; conversion; and civil conspiracy. *See* Doc. No. 42-1. Defendants Escamilla, Jimenez, and Martinez also move to dismiss Plaintiff's claim for violation of the Computer Fraud and Abuse Act, and violation of California's Comprehensive Computer Data Access and Fraud Act. *See id.* Defendants German and Elite Women Surrogacy LLC have also filed a motion to dismiss, joining Defendants Nash, Simas,

---

[2] Hereinafter, for purposes of this Order, the Court refers to this cause of action as the DTSA claim.

Macias, Munoz, and Leon's motion to dismiss in its entirety, and arguing additional grounds for dismissal of the DTSA claim against Defendant German and all claims against Defendant Elite Women Surrogacy LLC. *See* Doc. No. 43-1. Plaintiff opposes dismissal [Doc. No. 45 ("Oppo.")], and Defendants' filed a joint reply [Doc. No. 46 ("Reply")].

### 1. *Legal Standard*

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). However, plaintiffs must also plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). The plausibility standard demands more than "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and alterations omitted). Instead, the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not take legal conclusions as true merely because they are cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the

complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908; *see also* Fed. R. Evid. 201; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 936, 942 (9th Cir. 2009). A document "may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Ritchie*, 342 F.3d at 908 (internal citations omitted). In other words, a court "may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds in Abrego v. Dow Chem. Co.*, 443 F.3d 676 (9th Cir. 2006); *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Where dismissal is appropriate, a court should grant leave to amend unless the plaintiff could not possibly cure the defects in the pleading. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

**2. *Analysis***

Because the Court's jurisdiction over this action is based on federal question jurisdiction, the Court begins by addressing the sufficiency of Plaintiff's federal claims.

**a. *Defend Trade Secrets Act of 2016***

Plaintiff alleges a claim for violation of the Defend Trade Secrets Act of 2016. FAC, ¶¶ 39-57. On May 11, 2016, Congress enacted the DTSA, which creates a civil cause of action for owners of trade secrets that are misappropriated "'if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *See Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177-SI, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017) (citing 18 U.S.C. § 1836(b)(1)). The DTSA only provides a cause of action for acts that occurred on or after the date of its enactment. *Id.* at *3; *Wang v. Golf Tailor, LLC*, No. 17-CV-00898-LB, 2017 WL 2861111, at *4 (N.D. Cal. July 5, 2017). "Trade secret" is defined as "all

forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" so long as the information "derives value from being secret," and "the owner took reasonable measures to keep [it] secret." *See* 18 U.S.C. § 1839(3); *Cave Consulting Grp., Inc.*, 2017 WL 1436044, at *3. "Misappropriation" includes both the "acquisition of a trade secret" "by a person who knows or has reason to know that the trade secret was acquired by improper means" and "disclosure or use of a trade secret . . . without express or implied consent by a person who [] used improper means to acquire knowledge of the trade secret," or "knew or had reason to know that the knowledge" was gained through a person who had improperly acquired it or owed a duty to maintain its secrecy. *See* 18 U.S.C. § 1839(5). In sum, the DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *See Cave Consulting Grp., Inc.*, 2017 WL 1436044, at *4; 18 U.S.C. § 1839(5).[3]

Defendants argue Plaintiff insufficiently pleads a DTSA claim because Plaintiff fails to give Defendants fair notice of the alleged trade secrets and to allege the existence of trade secrets, Plaintiff fails to sufficiently allege it took reasonable efforts to maintain the secrecy of the alleged trade secrets, Plaintiff failed to allege that Defendants had the requisite mental state, and Plaintiff failed to adequately allege misappropriation. Doc. No. 41-1 at 14-23. "To survive a motion to dismiss a trade secret misappropriation claim, the plaintiff must allege facts that plausibly support the claim that the defendant 'acquired

---

[3] Several courts have analyzed the DTSA and California's Uniform Trade Secrets Act ("CUTSA") in tandem due to their similarities. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (noting that the definition of "improper means" under the DTSA and the CUTSA are nearly identical); *see also Veronica Foods Co. v. Ecklin*, No. 16-cv-07223-JCS, 2017 WL 2806706, at *13 ("Due to the overlap between the statutes, several courts have addressed DTSA claims in conjunction with claims under the CUTSA and other states' versions of the Uniform Trade Secrets Act."). However, the Court is unpersuaded by Defendants' argument that CUTSA law sets the contours of Plaintiff's DTSA claim to the extent argued by Defendants. *See* Doc. No. 41-1 at 15-16.

the trade secrets by one of the improper means listed [under the statute].'" *Select Timber Prods. LLC v. Resch*, No. 3:17-cv-00541-HZ, 2017 WL 3709066, at *3 (D. Or. Aug. 27, 2017) (citing *AccentCare Home Health of Rogue Valley, LLC v. Bliss*, No. 1:16-cv-01393-CL, 2017 U.S. Dist. LEXIS 88125, at *12 (D. Or. Apr. 13, 2017)).[4]

### i. Existence of Trade Secrets

Defendants assert that "surrogate applications, screening forms, email templates, FAQ pages, intake forms, and benefit lists could not possibly be trade secrets, as by their very definition, they are presented to" the surrogates and because they are merely "general methods of doing business." Doc. No. 41-1 at 19. Defendants further assert that because the qualifications for a gestational carrier are established by medical necessity and guidelines, Plaintiff's screening processes and forms are merely general business practices and not trade secrets. *Id.* Plaintiff argues that screening processes and methods are at least plausibly a protectable trade secret, but does not address Defendants' argument that disclosure to the surrogates extinguishes this right. *See* Oppo. at 13-18.

District courts in the Ninth Circuit have previously held that where a purported trade secret was publicly disclosed before the effective date of the DTSA, the plaintiff could not rely on a theory that the same information was again disclosed after the effective date because "'disclosure,' by definition, implies that the information was previously secret." *Avago Technologies U.S. Inc. v. Nanoprecision Products, Inc.*, No. 16-cv-03737-JCS, 2017 WL 412524, at *9 (N.D. Cal. Jan. 31, 2017) (citing *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1355 (Fed. Cir. 2009) ("[o]nce the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished")); *see also Wang*, 2017 WL 2861111, at * 4-5. The DTSA itself states that a trade secret is information that "derives independent economic value,

---

[4] As discussed in the Court's prior order, "the Court applies general pleading standards, which require plausibility as opposed to particularity. In other words, the Court finds unpersuasive Defendants' argument that Plaintiff must plead DTSA claims with particularity, as is required of plaintiffs asserting claims under CUTSA." Doc. No. 33 at 16.

actual or potential, from not being *generally known to*, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B) (emphasis added).

In any event, when considering a Rule 12(b)(6) motion, the Court accepts as true all factual allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1150 n.2 (9th Cir. 2000). These allegations must be construed in the light most favorable to the nonmoving party. *Scwharz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). In contradiction to Defendants' argument, Plaintiff alleges that it is "a top-tier integrated agency known nationally and internationally," that "has invested and spent significant time and resources" developing and creating processes for recruiting and screening surrogates that are uniquely and specifically tailored to Plaintiff's services. FAC, ¶¶ 18, 22-23. This effectively counters Defendants' argument that the alleged trade secrets are merely general methods of doing business. *See* Doc. No. 41-1 at 19. In addition to the uniquely tailored characteristics, Plaintiff alleges the trade secrets are not generally known because employees sign PIIAA agreements and potential surrogates and intended parents enter into confidentiality agreements. FAC, ¶¶ 49, 51. This counters Defendants' argument that the information is publicly disclosed to the extent that the information is no longer a trade secret. *See* Doc. No. 41-1 at 19. Based on the uniquely tailored characteristics and efforts to maintain secrecy through confidentiality agreements and PIIAA agreements, Plaintiff has plausibly alleged that it's screening methods and processes—including surrogate applications, screening forms, email templates, FAQ pages, intake forms, and benefit lists—are trade secrets.

Defendants also contend surrogate lists are not trade secrets. Doc. No. 41-1 at 20. Plaintiff explains that the surrogate lists "identify current surrogates under contract as well as potential surrogates and contain confidential and valuable data about those surrogates, such as information regarding their application for surrogacy, various

qualifications for surrogacy, screening status, contact information and, for surrogates under contract with Plaintiff, information regarding the status of their surrogacy." FAC, ¶ 41. In order to understand the value of these lists, Plaintiff explains the process for identifying and screening surrogates. Plaintiff alleges it "invested and spent significant time and resources" identifying and screening potential surrogates. FAC, ¶ 22. The recruitment and screening process requires potential surrogates to meet an initial screening criteria before signing an agreement (the "Acceptance Agreement"). FAC, ¶ 21. Following the Acceptance Agreement, the potential surrogates must undergo additional screening, which includes medical assessments and a review of medical history and a background check. *Id.* Then, the surrogates are presented for matching with intended parents, while undergoing even further medical screening and a psychological assessment. *Id.* Plaintiff specifies that it spent roughly $260-$300 per qualified surrogate in advertising costs alone. FAC, ¶ 41. Based on these allegations, it is plausible that a surrogate list constitutes information that derives value from being secret because a competitor could use a list of potential or current surrogates without expending the effort and cost of at least preliminarily screening them. *See Cave Consulting Grp., Inc.*, 2017 WL 1436044, at *3 (citing 18 U.S.C. § 1839(3)(A)-(B)).

        ii.    *Reasonable Efforts to Maintain Secrecy*

Defendants argue that Plaintiff does not allege it took reasonable efforts to maintain the secrecy of the alleged trade secrets. Doc. No. 41-1 at 21. Specifically, Defendants note that the PIIAA Plaintiff requires employees to sign, including some of the Defendants, does not describe any of the alleged trade secrets listed above and instead "contains unedited generic descriptions of common trade secrets." *Id.* Plaintiff alleges it took reasonable measures to keep this information secret by requiring all employees to sign the PIIAA, which requires employees to keep Plaintiff's proprietary information and trade secrets confidential during the course of their employment and after termination of their employment, and by requiring potential surrogates and intended parents to sign confidentiality agreements. FAC, ¶¶ 24, 49. The PIIAA defines proprietary information

as "all information . . . which is not generally known to the public or [Plaintiff's] industry, which has or could have a commercial value, actual or potential, or other utility in the business of [Plaintiff]." FAC, ¶ 24. The definition then lists examples, but specifies that the list is not an exhaustive list. *See id.* Further, the PIIAA defines trade secrets to mean "all proprietary information . . . that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." FAC, ¶25. Under the PIIAA, employees also agree that "[u]pon termination of employment, whether voluntary or involuntary, [the employee] shall not take nor allow a third party to take, and shall deliver to [Plaintiff], all original copies and all reproductions of Proprietary Information, or property of any nature belonging to [Plaintiff] or pertaining to his or her work with [Plaintiff]." FAC, ¶ 48.

Defendants contend that because "surrogate lists" and the "basic subject matter" of the alleged trade secrets are not specified in the PIAA, the PIAA is not a reasonable effort to maintain secrecy. Doc. No. 41-1 at 21. The Court finds this argument unpersuasive, as the PIAA clearly indicates that the list of examples is not exhaustive and includes all information not generally known to the public which has or could have commercial value, including trade secrets. *See* FAC, ¶¶ 24-25. Thus, the Court finds that Plaintiff plausibly alleges that it took reasonable measures to keep the alleged trade secrets secure by requiring employees to sign agreements assuring their confidentiality and limiting access to Plaintiff's property upon termination of employment. *See PEO Experts CA, Inc. v. Engstrom*, No. 2:17-cv-00318-KJM-CKD, 2017 WL 4181130, at *6 (E.D. Cal. Sept. 21, 2017) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (finding that a confidentiality agreement supported "reasonable efforts")); *see also Protection Technologies, Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *2 (D. Nev. Mar. 8, 2017) (finding that the plaintiff took reasonable measures

1  to keep the alleged trade secrets secure by requiring employees to sign confidentiality

2  agreements and limiting their access to the information).

3  ### iii.    Defendants' Mental State

4  Defendants assert that Plaintiff insufficiently pleads a DTSA claim because it fails

5  to adequately allege that Defendants knew the alleged trade secrets were proprietary, that

6  Defendants intended to convert the alleged trade secrets, and that Defendants intended or

7  knew that Plaintiff would be injured.  Doc. No. 42-1 at 21.  In support of their argument,

8  Defendants cite to 18 U.S.C. § 1832, which requires the Government to prove, among

9  other things, that a criminal defendant intended to convert the proprietary information,

10  that the defendant knowingly stole, copied, or received trade secret information, and that

11  the defendant intended or knew the offense would injure the owner of the trade secret.

12  *See United States v. Wen Chyu Liu*, 716 F.3d 159, 169-70 (5th Cir. 2013) (citing 18

13  U.S.C. § 1832).  However, the Court applies the law of the DTSA in this civil action.

14  Under the DTSA, misappropriation means both the "acquisition of a trade secret" "by a

15  person who *knows or has reason to know* that the trade secret was acquired by improper

16  means" and "disclosure or use of a trade secret . . . without express or implied consent by

17  a person who [] used improper means to acquire knowledge of the trade secret," or "*knew*

18  *or had reason to know* that the knowledge" was gained through a person who had

19  improperly acquired it or owed a duty to maintain its secrecy.  *See* 18 U.S.C. § 1839(5)

20  (emphasis added).  Moreover, the DTSA defines "improper means" to include "theft,

21  bribery, misrepresentation, breach or inducement of a breach of a duty to maintain

22  secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6)(A).

23  Plaintiff alleges that Defendants "conspired . . . to misappropriate Plaintiff's trade

24  secrets, proprietary information, and property and to steal Plaintiff's surrogate clients and

25  employees, all while [Defendant] German and many of the Defendants were still working

26  for Plaintiff, in violation of their common law duty of loyalty to their employer and in

27  breach of the PIIAA they all signed as a condition of their employment."  FAC, ¶ 28.

28  Accordingly, Plaintiff alleges that Defendants knew or had reason to know they were

misappropriating Plaintiff's trade secrets through improper means because the employee-Defendants were violating the PIIAA and the non-employee Defendants had reason to know the trade secrets were acquired, disclosed, and being used in violation of the PIIAA. FAC, ¶¶ 28, 50. Plaintiff also alleges that the non-employee Defendants are Defendant German's husband and sisters-in-law, further enhancing the plausibility of their knowledge resulting from a close personal relationship. FAC, ¶¶ 29, 33. When construing these allegations in the light most favorable to Plaintiff, it is plausible that Defendants knew or had reason to know that the alleged trade secrets were misappropriated as defined by the DTSA. *See* 18 U.S.C. § 1839(5).

### iv. Misappropriation

Defendants also contend that Plaintiff fails to allege any conduct amounting to misappropriation after the enactment of the DTSA. Doc. No. 41-1 at 22. Specifically, Defendants contend that Plaintiff's allegations lumps each Defendant's alleged role in the purported misconduct rather than specifying factual allegations as to any specific act by each Defendant. *Id.* Defendants also contend the DTSA does not allow a misappropriation claim based on use of information disclosed prior to the effective date of the DTSA. *Id.* at 22-23.

Courts have generally "held that the DTSA applies to misappropriations that began prior to the DTSA's enactment if the misappropriation continues to occur after the enactment date." *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017). In addition, "[n]othing suggests that the DTSA forecloses a use-based theory simply because the trade secret being used was misappropriated before the DTSA's enactment." *Cave Consulting Grp.*, 2017 WL 1436044, at *4.

Plaintiff alleges that Defendants initially possessed trade secret information by virtue of their employment. FAC, ¶¶ 27-30. Defendant German and the other Defendants began conspiring in the spring of 2016 to misappropriate Plaintiff's trade secrets, proprietary information, and property, and to steal Plaintiff's surrogate clients

and employees in order to form a competing surrogacy agency.  FAC, ¶ 28.  They created a third-party email address, rsmcsurrogacy@gmail.com in early 2016 and began emailing lists of Plaintiff's surrogates, potential surrogates, proprietary forms, intake forms, surrogacy applications, and other documents to rsmcsurrogacy@gmail.com from their work email accounts.  FAC, ¶ 29.  Plaintiff alleges that Defendants Escamilla and Jimenez maintained and used the third-party email address to send emails to surrogates and potential surrogates.  FAC, ¶ 33. Additionally, Defendant German sent similar documents and information to her husband, Defendant Martinez's personal email address on or around April 29, 2016.  *Id.*  Defendant Martinez allegedly purchased computer hardware to store all of the information received.  *Id.*  Plaintiff alleges that this conduct appears to have begun on or around April 5, 2016 and continued until February 2017, when Defendant German resigned from her position.  FAC, ¶ 30.  After enactment of the DTSA in September 2016, October 2016, and January 2017, Defendants emailed "trade secrets and proprietary information, reflecting Plaintiff's unique business methods, systems, procedures, and programs, along with confidential surrogate lists," to rsmcsurrogacy@gmail.com.  FAC, ¶ 30.

With respect to a use theory of liability, Plaintiff alleges that Defendant German and Defendant Martinez "filed for a fictitious business name of 'Elite Women Surrogacy' with the County of Orange Clerk-Recorder" on December 20, 2016.  FAC, ¶ 35.  The Elite Woman Surrogacy Facebook page further indicates that the business began on November 12, 2016.  *Id.*  On or around April 20, 2017, Defendant German filed a form LLC-1 with the California Secretary of State to legally form Elite Women Surrogacy.  FAC, ¶ 36.  Plaintiff, upon information and belief, alleges that Defendants German, Nash, Simas, Macias, Munoz, Escamilla, Jimenez, Leon, and Martinez all currently work for Elite Women Surrogacy.  FAC, ¶ 38.  Also upon information and belief, Plaintiff alleges that each of the Defendants have been using the alleged trade secrets in forming and operating Elite Women Surrogacy to solicit potential surrogates and induce Plaintiff's potential and current surrogates to leave Plaintiff and engage with Elite Women

Surrogacy since November 12, 2016. FAC, ¶ 53. Specifically, Plaintiff alleges that Defendants Escamilla and Jimenez "maintained and used the rsmcsurrogacy@gmail.com and sent emails to surrogates and potential surrogates using the account." FAC, ¶ 33. Additionally, Plaintiff alleges that each of the Defendants are using the alleged trade secrets and intend to continue disclosing and using the alleged trade secrets for their own financial benefit in forming and operating Elite Women Surrogacy. FAC, ¶ 53.

Plaintiff's allegations with respect to each Defendant's conduct are largely conclusory. While Plaintiff specifies that Defendants Escamilla and Jimenez maintained and used the third-party email address to send emails to surrogates and potential surrogates, Plaintiff does not identify when this conduct occurred. *See* FAC, ¶ 33. Moreover, Plaintiff's allegation that "Defendants, and each of them, are willfully and improperly using [the alleged trade secrets] and intend to disclose and use [the alleged trade secrets]" is a "legal conclusion couched as a factual allegation" that does not meet Plaintiff's burden of pleading. *Papasan v. Allain*, 478 U.S. 264, 286 (1986); *see also* FAC, ¶ 53. Plaintiff does specify that Defendant German sent emails to Defendant Martinez prior to the DTSA enactment date and that Defendant Martinez purchased computer hardware to store the information. FAC, ¶ 29. However, Plaintiff does not factually allege that any specific Defendant used or disclosed this information after the enactment date. *See* FAC, ¶¶ 29-53. To state a claim under the DTSA, Plaintiff must more specifically connect allegations of misappropriation to specific Defendants' actions.[5] *See Veronica Foods Co.*, 2017 WL 2806706, at *14.

---

[5] Because the DTSA permits a theory of liability based upon use of information misappropriated prior to enactment of the DTSA and Plaintiff alleges Defendants are currently using its alleged trade secrets, it is plausible that Elite Women Surrogacy LLC could be liable if Plaintiff provides sufficient factual allegations. Accordingly, the Court declines to address Defendant Elite Women Surrogacy LLC's argument that it "could not have engaged in, or be responsible for, any of the conduct alleged in Plaintiff's FAC" because the LLC was not formed until April 20, 2017. Doc. No. 43-1 at 5-6. Further, even though Plaintiff did not seek leave to amend its complaint to add a new party, the Court grants Plaintiff leave to add Elite Women Surrogacy LLC as a defendant in this action. *See* Fed. R. Civ. P. 15(a)(2), (c)(1); *see also* Doc. No. 43-1 at 6.

### v. Conclusion

As pleaded, the DTSA claim does not allow the court to draw a reasonable inference about which individual Defendant is liable and for which acts. *See Ashcroft*, 556 U.S. at 678. Accordingly, the Court **GRANTS** Defendants Nash, Munoz, Simas, Macias, and Leon's request for dismissal of the DTSA claims—which Defendants Escamilla, Jimenez, Martinez, German, and Elite Women Surrogacy LLC joined—and **DISMISSES** those claims without prejudice, and with leave to amend as to all Defendants.

### b. The Federal Computer Fraud and Abuse Act

Plaintiff also alleges a violation of the Computer Fraud and Abuse Act against Defendants Escamilla, Jimenez, and Martinez. FAC, ¶¶ 68-73. The Computer Fraud and Abuse Act ("CFAA"), a federal statute, "was originally designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possessed the capacity to 'access and control high technology processes vital to our everyday lives . . . .'" *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009) (citing 1131 H.R. Rep. 98-894, 1984 U.S.C.C.A.N. 3689, 3694 (July 24, 1984)). "The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." *See id.* at 1131 (citing 18 U.S.C. § 1030(a)(1)-(7)).

Relevant here, section 1030(a)(4) provides for the punishment of any individual who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value . . . ." *See id.* (citing 18 U.S.C. § 1030(a)(4)). Section 1030(g) of the act provides a private right of action for individuals who have been injured by the crimes delineated by the CFAA so long as the defendant's conduct involves one of the factors set forth in section 1030(c)(4)(A)(i), subclause (I),

(II), (III), (IV), or (V).  *See id.*; 18 U.S.C. § 1030(g).  Subclause (I) proscribes conduct that causes a loss of at least $5,000 to one or more persons during any one-year period.  *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).  Thus, to bring a civil action for a violation of § 1030(a)(4), a plaintiff must show that the defendant: "(1) accessed a 'protected computer,' (2) without authorization or exceeding such authorization that was granted, (3) 'knowingly' and with 'intent to defraud,' and thereby (4) 'further[ed] the intended fraud and obtain[ed] anything of value,' causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value."  *See Brekka*, 581 F.3d at 1131 (citing 18 U.S.C. §§ 1030(a); *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005); *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004)).

Defendants Escamilla, Jimenez, and Martinez contend that Plaintiff does not sufficiently plead a CFAA claim.  Doc. No. 42-1 at 7.  Specifically, they contend that "[t]here are zero factual allegations that any of the Non-Employee Defendants actually accessed any computer system owned or controlled by Plaintiff."  *Id.*  Plaintiff opposes, contending that the allegations in the FAC are sufficient.  Oppo. at 28-29.

Plaintiff alleges that from April 2016 until February 2017, Defendants Escamilla, Jimenez, and Martinez "accessed Plaintiff's protected computer," that Plaintiff never "expressly or impliedly, gave [them] permission . . . to access its protected computer," and never gave them "login access, information or passwords to use Plaintiff's computers."  FAC, ¶ 69.  Plaintiff also alleges that Defendants Escamilla, Jimenez, and Martinez "intended to, and did, misappropriate and steal [the alleged trade secrets] and proprietary information to form their own business to compete with Plaintiff."  FAC, ¶ 70.  As a result, Plaintiff alleges Defendants Escamilla, Jimenez, and Martinez "were able to steal Plaintiff's entire database of surrogates and fraudulently induced many of them to break their contract with Plaintiff and instead engage Defendants' competing business . . . ."  FAC, ¶ 71.  According to Plaintiff, it "suffered economic damages as a direct result."  FAC, ¶ 72.

The Court finds that Plaintiff has not pleaded facts giving rise to a valid claim under the CFAA. Among other deficiencies, Plaintiff does not allege how or where Defendants Escamilla, Jimenez, and Martinez accessed Plaintiff's protected computers. *See Delacruz v. State Bar*, 16-cv-06858-BLF (SVK), 2017 U.S. Dist. LEXIS 115272, at *17-18 (N.D. Cal. June 21, 2017) (recommending that the plaintiff's CFAA claims be dismissed as too conclusory with respect to the defendant's purported "access"), *adopted by Delacruz v. State Bar*, 2017 U.S. Dist. LEXIS 15277 (N.D. Cal. July 24, 2017). Plaintiff's CFAA claim is merely a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements" and does not permit the Court to draw a reasonable inference that Defendants Escamilla, Jimenez, and Martinez are liable under the CFAA. *See Ashcroft*, 556 U.S. at 678. As such, the Court **GRANTS** Defendant Escamilla, Jimenez, and Martinez's motion to dismiss Plaintiff's CFAA claims, and **DISMISSES** Plaintiff's CFAA claims against those defendants without prejudice and with leave to amend.

### c.    *Plaintiff's State Law Claims*

"A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), *superseded on other grounds by statute as recognized in Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 557 (10th Cir. 2000)).

Plaintiff also asserts numerous California state law claims. *See* FAC. However, because Plaintiff fails to state a claim over which the Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims at this time. *See Shames v. Hertz Corp.*, No. 07-CV-2174 H (BLM), 2008 WL 11318291, at

*5 (S.D. Cal. Apr. 8, 2008). As such, the Court **DISMISSES** Plaintiff's supplemental state law claims without prejudice as to all Defendants. If Plaintiff sufficiently alleges a federal claim in a future amended complaint, the Court will reconsider exercising supplemental jurisdiction over Plaintiff's state law claims.

### d. *Defendants' Requests for Judicial Notice*

In support of their motion to dismiss, Defendants Nash, Munoz, Simas, Macias, and Leon request the Court take judicial notice of a copy of a PIIAA agreement, a copy of the Recommendations for Practices Utilizing Gestational Carriers by the American Society for Reproductive Medicine, a copy of an Ethics Committee opinion regarding "consideration of the gestational carrier," and several emails sent by Defendant German. Doc. No. 41-2 at 2-3. However, judicial notice of these documents is unnecessary for the instant purposes, as the Court finds dismissal is proper without reference to those documents. *See Ruiz v. City of Santa Maria*, 160 F.3d 543, 548 n.13 (9th Cir. 1998) (stating that judicial notice is inappropriate where the facts to be noticed are not relevant to the disposition of the issues before the court). Accordingly, the Court declines to take judicial notice of the proffered documents.

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff moves for a preliminary injunction based on its claims for violation of the DTSA, violation of California's Business and Professions Code, breach of contract, and conversion. *See* Doc. No. 40-1.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008). "A plaintiff seeking a preliminary injunction must establish that he is" (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20; *see JL Bev. Co., LLC v. Jim Bean Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016) (stating that the plaintiff "bears the burden of establishing the merits of its claims" on a motion for preliminary injunction). The Ninth Circuit employs a "'sliding scale'

approach to evaluating the first and third *Winter* elements," which dictates that "a preliminary injunction may be granted when there are 'serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff,' so long as 'the other two elements of the *Winter* test are also met.'" *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 1131-32 (9th Cir. 2011) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 771, 776 (9th Cir. 2011)). "Serious questions" are "'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952)). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

Because the Court dismisses all claims against Defendants without prejudice and with leave to amend, Plaintiff has not shown a likelihood of success or serious questions going to the merits of Plaintiff's claims. *See Winter*, 555 U.S. at 20 (stating that a plaintiff seeking a preliminary injunction must generally establish a likelihood of success); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (stating that, alternatively, a plaintiff may demonstrate "serious questions going to the merits," meaning at least a "fair chance of success on the merits," and that equities tip sharply in the plaintiff's favor).

As such, the Court **DENIES** without prejudice Plaintiff's motion for a preliminary injunction. *See* Doc. No. 40; *see Shames*, 2008 WL 11318291, at *5 (denying without prejudice motion for preliminary injunction on basis that the court dismissed without prejudice all federal claims and declined to exercise supplemental jurisdiction over state law claims); *Youngevity Int'l Corp. v. Smith*, No. 16-CV-0704 W (JLB), 2016 WL 7626582, at *5 (S.D. Cal. June 29, 2016); *Kwai Ling Chan v. Chase Home Loans, Inc.*, No. C12-0273JLR, 2012 WL 1252649, at *2 (W.D. Wash. Apr. 13, 2012).

17cv718-MMA (WVG)

## CONCLUSION

For the foregoing reasons and as set forth above, the Court **GRANTS IN PART** Defendants' motions and **DISMISSES** without prejudice all claims against all Defendants. *See* Doc. Nos. 41, 42, 43. The Court further **ORDERS** that Plaintiff must file a Second Amended Complaint, if any, on or before **March 5, 2018**.[6] Further, the Court **DENIES** without prejudice Plaintiff's motion for a preliminary injunction. Doc. No. 40.

**IT IS SO ORDERED**.

Dated: January 31, 2018

Hon. Michael M. Anello
United States District Judge

---

[6] The Court further notes that Plaintiff must comply with Civil Local Rule 15.1(c), which states that "[a]ny amended pleading filed after the granting of a motion to dismiss or motion to strike with leave to amend, must be accompanied by a version of that pleading that shows—through redlining, underlining, strikeouts, or other similarly effective typographic methods—how that pleading differs from the previously dismissed pleading." Civ. LR 15.1(c).

17cv718-MMA (WVG)